CUTTYHUNK BOAT LINES, Inc. et al. v.
THE MARY J. HAYES et al.

No. 51–53.

United States District Court
D. Massachusetts.

April 8, 1953.

Harry Kisloff, Boston, Mass., for plaintiff.

Seymour P. Edgerton, Bingham, Dana & Gould, Boston, Mass., for defendant.

FORD, District Judge.

This is a libel for salvage brought by Cuttyhunk Boat Lines, Inc., hereinafter called Cuttyhunk, Cranford W. Fleming, owner of all the stock in the corporation, and Max Chapman, employed aboard the diesel towing vessel Anton Dohrn, hereinafter called The Dohrn, of which Fleming was owner. Fleming does business under the corporate name of Cuttyhunk. The services for which this libel was brought were rendered to the F/V Mary J. Hayes, hereinafter called The Hayes, a three-quarter interest in which is owned by the respondent Murley.

The facts are as follows:

1. The salving vessel Dohrn was built in 1911 as a yacht and later converted to the towing service. She is 60.1 feet long with a beam of 15.9 feet and was purchased in 1948 by Fleming for $22,500. Additions were made to her (a towing winch, $2,500 and 1,800 feet of ⅝ths-inch steel wire at a cost of $432. Fleming testified the vessel was worth $30,000 at the time of the towing services. Allowing for depreciation, I find a fair value at time of services, February 7, 1951, to be $23,000.

2. The Hayes was a wooden vessel 89.3 feet long with a beam of 20.3 feet, powered with a 250 horsepower Atlas diesel engine and was worth at time of salvage services $70,000.

3. The services were performed on February 7, 1951. The weather was stormy with a strong southerly wind and driving rain. The winds averaged about 33 miles per hour with gusts up to 55 to 60 miles. The weather conditions were not extraordinary in New Bedford Harbor at the time of salvage.

4. Shortly before 7:30 p. m., The Hayes was observed adrift and proceeding up the harbor propelled by the wind and tide. She passed to the northward just off the pier ends on the Fairhaven shore, and after passing the end of Kelley's Wharf, she went aground in the mud to the eastward of Crow Island at a point on the

north side of the channel leading to Mullen's Freezer.

5. Mr. Burbine, the commanding officer of the Coast Guard Tug Arundel, telephoned to libelant Fleming at his home to learn whether Fleming would take The Dohrn in pursuit of the drifting fishing vessel. The reason that this request was passed from the Coast Guard to libelant Fleming was because Mr. Burbine feared that the shoalness of the water to the eastward of Crow Island in New Bedford Harbor would not permit the ready maneuverability of The Arundel. However, The Arundel was standing by and maintaining a close radio-telephone watch so as to be in a position to respond immediately should The Dohrn call for assistance. No request for assistance was made.

6. The Dohrn and the libelants Fleming and Chapman started their salvage services about 7:30 p. m. Two Coast Guard men from The Arundel went aboard The Dohrn to assist them in the operation. The Hayes reached Pier 3 at about 8:30 p. m., after having been released from the mud, and all of the services of the libelants and The Dohrn had been completed by about 9 p. m.

7. The salvage services were performed promptly and they were successful.

8. The Hayes was drifting to the northward in New Bedford Harbor. Her limit of movement was thus definitely fixed. Her owner was immediately notified and he and the vessel's master proceeded at once to the waterfront. The United States Coast Guard, its facilities and personnel were available.

9. The harbor of New Bedford is not exposed to the open sea even in a south wind since the entrance to the harbor is protected by the Elizabeth Islands across the lower end of Buzzards Bay.

10. I find that The Hayes had grounded in soft mud and sand and that she suffered no damage in the salvage operation.

11. I find that the towing wire of The Dohrn was let go from The Hayes when both vessels were in the main waters of New Bedford Harbor due either to a misunderstanding on the part of the two Coast Guard ratings who were then on The Hayes or to their inability to hold the wire when attempting to shift it from the stern of The Hayes to her bow.

12. I find that The Dohrn lost 800 feet of towing wire and that there remained on her towing winch 1,000 feet of towing wire which has since been used by The Dohrn in her towing services without having been lengthened by a splice.

13. I find that The Dohrn sustained certain damage in the course of salvage operations. Her towing wire became entangled in her port propeller, rendering that engine inoperative, and was also wound around the starboard propeller shaft, although not sufficiently to prevent the operation of the starboard engine. Shortly after February 7, The Dohrn was hauled out at Kelley's Shipyard in New Bedford, the wire was cleared from the propeller shafts and a new eye splice was made on the end of the wire. The expense of this work is properly chargeable to this salvage operation, and I find that libelant Fleming is entitled to recover for this item the sum of $68.89.

14. I find that in May The Dohrn was again hauled out, this time at the Peirce & Kilburn yard, at which time the propellers and shafts were straightened. At the same time ordinary overhauling work, including washing the vessel's bottom and painting her bottom and topsides, was done. The total expense for this work was $463.13. I find that of that amount the normal overhauling work amounted to $175. This amount must be deducted from the shipyard bill.

15. I find the damage to the propellers and shafts amounted to $300. The evidence shows these items were used after the services and not repaired for at least three months.

16. I find that the loss to libelant Fleming resulting from the loss of 800 feet of towing wire at its cost price to him of 24 cents per foot is $192, which is awarded. In addition, the remaining wire was somewhat depreciated in its value to libelant Fleming, because of it being shorter than originally fitted, and I therefore

award him $100 in addition to the $192, or a total of $292.

17. For the salvage services performed by the libelants Fleming and Chapman and the vessel Dohrn, I award the sum of $1,500.

18. I find that Cuttyhunk had no participation whatever in the salvage, either by reason of any interest which it might have had in The Dohrn or by reason of any services which it performed, and I consequently rule that that libelant is not entitled to participate in this salvage award.

19. I find that libelant Chapman employed a reasonable degree of nautical skill and seamanship in handling The Dohrn during the period in question. For those services I rule that he should receive the sum of $200 out of the amount previously awarded for the total salvage services.

I cannot find any extraordinary salvage services in this case. Certainly neither Fleming nor Chapman underwent any extreme perils or hazards. The seas were only 5–6 feet in New Bedford Harbor on the night in question, and from the position of The Hayes in the mud on Crow Island, I cannot find that The Hayes was in any grave peril. The next high tide after the evening of February 7 would occur in New Bedford at 9:11 a. m. on February 8, 1951, and the predicted height of that high tide for New Bedford was 4.1 above mean low water. The second high tide would be at 9:34 p. m. on February 8, and the predicted height of that tide, above mean low water, was 4 feet. I find The Hayes could have been pulled off at either of these tides without damage to her, as was the case when The Dohrn salved her. There was not at any time damage to The Hayes. Furthermore, as Captain Murley testified, by lightening her load of fuel oil and by using her own propelling power and that of two other fishing vessels, in which he possessed an interest, he could have pulled her off without any help from The Dohrn.

This was not a dangerous salvage job that was performed by the libelants. True, some amount must be given the salvors in addition to their usual compensation for their services voluntarily given, but I believe the amount indicated above is fair in the light of all the circumstances. Some consideration has been given and should be given to the fact that The Dohrn was performing the type of work she usually did in New Bedford Harbor and that by no means have we presented here an unusual situation.

Decree accordingly, with costs.